UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CR-20466-JB

UNITED STATES OF AMERICA, Miami, Florida

January 23, 2026

vs.

2:12 p.m. - 3:16 p.m.

TIRON ALEXANDER,

Defendant. Pages 1 to 45

---

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
DANIEL ROSENFELD
U.S. Attorney's Office
99 NE 4th Street
Miami, Florida 33128

FOR THE DEFENDANT:
EBONI BLENMAN
PAUL ELLIOTT CARSON
Federal Public Defender's Office
150 West Flagler Street
Suite 1700
Miami, Florida 33130

STENOGRAPHICALLY REPORTED BY:

VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

10:20AM

02:03PM (Call to order of the Court at 2:12 p.m.)

02:12PM THE COURTROOM DEPUTY: Case No. 24-CR-20466-Becerra, United States of America vs. Tiron Alexander.

02:13PM Counsel, please state your appearances for the record, starting with the government, the defendant, and then probation.

02:13PM MR. ROSENFELD: Good afternoon, Judge. AUSA Daniel Rosenfeld, along with Special Agent Gaden Piant for the United States.

02:13PM THE COURT: Good afternoon.

02:13PM MS. BLENMAN: Good afternoon, Your Honor. Eboni Blenman and Paul Carson, Assistant Federal Defenders on behalf of Mr. Tiron Alexander, who is present before the Court.

02:13PM MS. SYLVESTER-PIERRE: Good afternoon, Your Honor. Danielle Sylvester-Pierre on behalf of U.S. Probation.

02:13PM THE COURT: All right. Good afternoon. Everyone be seated. I know we're here for sentencing, but I still have the motion for judgment of acquittal that's pending, and so I am going to announce my ruling from the bench so that we can move forward for sentencing.

02:13PM First of all, I appreciate everybody's patience. This case -- I'm sorry, Mr. Alexander. I know you've been waiting to be sentenced. It seemed like every time I scheduled it, there was something going on or there was something wrong with the calendar or I was in trial. I think your counsel at one point had a conflict, you had a conflict. These usually don't take this long.

02:14PM But even today I thought there was a chance because I was in a trial that we wouldn't be able to get to you; so I apologize. We really have just been caught up in one thing or the other, and we just haven't been able to get to this motion.

So there is a motion for judgment of acquittal, or in the alternative a motion for dismissal or a mistrial with prejudice. I am going to deny that motion, but I do want to go through my reasoning for that motion because there is a varied number of attacks on the indictment, on the prosecution; and again, I want to make sure the record is clear on my reasoning as to each.

So the first basis for the Rule 29 is what I will call the Ciminelli argument, and I ruled on this pretrial. I am going to rule again in favor of the government on this. You know, look, I think on behalf of the defendant, I think this is a fair issue to raise. This isn't I don't think clear-cut. I think it is an argument that I think was worth making.

02:15PM But as I see it, the money or property here is not the jump seat. So I understand the argument is that the jump seat has no value; and Ciminelli really takes that kind of fraud out of the mix. I don't think that that's that narrow. First of all, even if I were just to see the jump seat, that jump seat is the property of the airline, right. And he is taking that property, he is taking possession if you will or use of something that is the property of the airline. So that is one way of looking at it.

And then the other way of looking at it, which I also

think takes us out of Ciminelli, is he is trying to defraud the airline. He is taking that jump seat in lieu of paying for travel, right. So there is that property element there. It's not that he otherwise doesn't travel or otherwise doesn't pay for it or otherwise doesn't benefit from it; he otherwise has to pay for the ticket. And so I didn't think it was a Ciminelli issue before trial, which is why I denied the motion beforehand; and I don't find it to be a Ciminelli problem even after having heard all the evidence and having the opportunity of seeing the briefing on it again; so I don't think that that's a basis.

The second basis for the Rule 29 was the issue of materiality. And look, this is the one that I was on at trial and at the argument on this first motion. There was, in fact, no evidence -- no clear evidence, right. The Spirit Airlines witness did not testify that the program was for current flight attendants. That was not the testimony, right; but that's not the standard.

So I think the government correctly argues now at Rule 29 when I have to take all the inferences in favor of the verdict, the question is was there enough evidence for the jury to have found that his misstatements were material. And so I listened at the trial, obviously, but I looked at the transcript as well. And for me there were a couple of places in the transcript where I thought, in addition -- I mean the government in its brief and they were really in the footnotes of its response -- but in the

transcript I also found some other areas where I think the testimony was there.

So the Spirit Airlines employee -- and look, this is one of the problems with that testimony -- the Spirit employee wasn't somebody who was familiar with the program. He was the investigator, and this is why I think he got jammed up so many times in these questions. He didn't have the foundation to really lay this out, and so that testimony was difficult for sure.

But he does say -- and this is on page 17 and 18 of Peitz's direct examination -- he says -- the question is:

Q. But with respect to what is required, how did you come to learn what the requirement is to take this type of nonrevenue travel?

And he says:

A. Yeah, so the portal for this travel is specific to pilots and flight attendants, which they need to have jump seat qualification, which is part of their initial and recurrent training, right.

Then he later says:

Q. What information does a flight attendant or a pilot need to reserve a flight on the Team Travel website?

A. First and last name, their date of hire, and the airline that they work for, and then an authorization code.

That testimony, taking -- which is what I have to do, right -- taking all the inferences and looking at it and trying to

02:19PM preserve the jury's verdict, which is my obligation, I think that evidence, it was sufficient on the materiality issue.

02:19PM And here, too, one thing that the government didn't argue but that I find to be persuasive, is that if the defendant had always put flight attendant and American Airlines, then the idea that the flight attendant alone, that he wasn't making a material representation about that, maybe that would be more convincing to me. But the fact is that he is continuously picking different airlines, and I think that the jury was entitled to conclude that that was the effort; that he knew and that they knew that the flight attendant had to be current, and that's why he kept putting different airlines in, right, because it would make the detection of that more difficult. Again, these are all the kinds of inferences that you can draw and that I have to draw on a Rule 29 post-verdict.

02:20PM And so was there clear testimony that the program requires you to be a flight attendant currently? No. Was there enough other evidence for the jury to have made that inference and for the jury to have concluded that that had to be material? I think that there was.

02:20PM And by the way, this was something that was argued, right. Like the jury knew. The defense argued "You didn't hear this evidence." The jury knew he wasn't a current flight attendant. The jury heard the evidence. So I think that, again, I think this is a close call, I really do. I thought it was a

close call during the trial. Not a close call because -- I mean I don't think there is any doubt, and this is one of the things I told Mr. Keller when he was here for the argument -- not that there is any doubt -- I don't think the government has any evidence or anybody has any evidence to suggest that the program wasn't, in fact, for current flight attendants; it's whether or not the government sufficiently put forth the evidence of that. It's the classic nobody identified the defendant kind of thing. That's how I saw this issue.

But in looking at the evidence, I think it is very close in my estimation of the evidence, and I had to read the transcripts again, but I think there is enough there for the jury to have not had to reach that by speculation; and so I agree with the government that it's not appropriate to set aside the jury's verdict.

The false pretenses, look, I can have my qualms with why you charged that, really. But the theory is that the boarding pass was coming from a fraudulent purchase of that ticket if you will; and so that boarding pass is that false pretense. Do I think that's a stretch? All day long that's a stretch, people. But does it fit the charge? Yes. Was there evidence of it? Yes, the jury found it.

I don't make the charging decisions. And for the life of me I don't know why the case was, honestly -- we've charged a $2100 fraud. I mean, whatever. But that's also something you

02:22PM have to wrap around your head maybe. But that's not my job here.
02:22PM My job here is to see whether the evidence was sufficient on the
02:22PM materiality. I think it's thin, but I think it's sufficient.

02:22PM And I think on the issue of the false pretenses on
02:22PM Count 5, I think that is not thin. I think it's an odd thing to
02:22PM charge; but if you believe the government's theory, and the jury
02:23PM did, that he had no right to have that boarding pass, and that is
02:23PM the thing that is the false pretense, it is very thin; but I think
02:23PM they have it.

02:23PM Now, the next motion is for judgment of acquittal for
02:23PM prosecutorial misconduct. And I think, you know, the transcript
02:23PM speaks for itself as to what I have thought of both what happened
02:23PM with the grand jury. I do think that faced with the situation
02:23PM that they were, that the U.S. Attorney's Office should have gone
02:23PM back to the grand jury and clarified that to the grand jury. I
02:23PM don't know if that's what the U.S. Attorney's Office Manual
02:23PM requires. I don't know that that's a breach of any ethical rule
02:23PM or any procedure at the U.S. Attorney's office; I just think that
02:23PM they should have done that.

02:23PM But the fact that I think they should have done that is
02:23PM neither here nor there. That doesn't make it misconduct, and that
02:23PM doesn't make it something for which I would set aside this
02:23PM verdict.

02:23PM Again, I think given that the grand juror specifically
02:24PM asked those questions, once that information -- because the

02:24PM information is clear, the agent didn't have that information when she was testifying. I don't have any reason to doubt that, and that's not the evidence. But when you find that evidence later, knowing that a grand juror was asking about that, and knowing that that is the material aspect of it, it takes five minutes to go back to the grand jury and make sure that's cleaned up. It bothered me that that wasn't done. But is that misconduct? I can't say that that's misconduct, and the defense doesn't really have any citation that it is, and I know of no reason why it would be misconduct.

02:24PM The other issues with the misconduct were all things I dealt with, and I think I dealt with it correctly at trial. I think the mention of the suspension was out of bounds, and I told Mr. Keller that. That's something that we had talked about. He shouldn't have done that. I think that the issue of the word "solid," do I think that's denigrating the defense? No. Did I think he should have said that? No, I don't think he should have said that. Do I think that's prosecutorial misconduct that rises to the level of a dismissal? No, I don't think that.

02:25PM And the burden shifting, which is the one that I was most troubled and upset by, I sustained that objection and I corrected it in front of the jury. So I think that although I think that some of the things that were said in that rebuttal closing were not right, again, that's not the standard. Were they the kind of pervasive misconduct for which I would set aside the jury's

verdict? I just don't think it rises to that level.

That's not to say that I think it was okay. It wasn't. I was pretty clear on the record what I thought of it. I told Mr. Kessler [sic] what I thought of it. I corrected it in front of the jury, and so I just don't think it rises to the level of misconduct. And quite frankly, I just think, at least my reading of the law, I don't think it's a close question on that, on the misconduct issue; that's not the kind of prosecutorial.

First of all, I am not making a finding that it was misconduct. I don't think it was misconduct; let's just start with that. I don't think it was misconduct. Do I think that those are things that a prosecutor should do? No, but that's neither here nor there. I didn't think that it was appropriate. I sustained objections. I corrected it. I did what I felt it was my obligation to do for the record, but that's not a dismissal of the indictment.

For me the much closer call is the materiality and the evidence. I still think that's a close call; but I think given the standard, I think my duty requires me to deny the motion. I think the Ciminelli thing is not quite as close a call; although, I could see why somebody in the Eleventh Circuit or at least two people on the Eleventh Circuit might disagree with me on it, right. I think there is a good argument that they're making. I don't think it's the right argument. Although I do think it's a good argument, I don't think it's the right argument. For me the

02:27PM materiality is much closer. All of that being said, I'm going to deny the motion and proceed to sentencing.

02:27PM I've read the PSI in detail more than once. So if somebody could just before we get into the weeds here of the PSI, I need to have a sense of where the government is going because there is no objection to the PSI. Well, let me just start with that.

02:27PM Government, I assume you're the prosecutor -- I don't know how you drew the short end of this straw to get this one. Just walk in here in front of Becerra after there's a motion to dismiss for all sorts of things; yeah, you do that one.

02:27PM Have you looked at this PSI?

02:27PM MR. ROSENFELD: Yes, Judge, I have.

02:27PM THE COURT: All right. And you've had an opportunity to review it, and you're prepared to move forward with the sentencing?

02:27PM MR. ROSENFELD: Yes, Judge.

02:27PM THE COURT: All right. Let me ask you, Ms. Blenman.

02:28PM Have you reviewed the PSI and reviewed it with your client?

02:28PM MS. BLENMAN: I have, Your Honor.

02:28PM I would say also, respecting the Court's ruling, not waiving of course our arguments as to the Rule 29, we are also prepared to go forward to sentencing.

02:28PM THE COURT: All right. So the guideline range, he is a

02:28PM total offense Level 12, criminal history category I, it's 10 to 16 months. There was initially some back-and-forth on the amounts, right. It's the defense's position that the loss amount is zero.

02:28PM Let me hear from you because there was some change in the loss amount. And what I'm not sure about is on the restitution whether you have affidavits yet. And I don't want to jump to the end of the story just yet, but can you just walk me through what you're arguing is the loss for purposes of sentencing and then what you're arguing for restitution.

02:28PM MR. ROSENFELD: Yes, Judge. So we're arguing it's about $10,000. And I have three witnesses here, Judge, who can testify as to how we arrived at that number.

02:29PM THE COURT: All right. Go through company by company.

02:29PM MR. ROSENFELD: Okay. So as to Spirit, the loss amount is 4717.

02:29PM THE COURT: Okay.

02:29PM MR. ROSENFELD: As to Southwest, the loss amount is $3,627.54.

02:29PM THE COURT: That's what I have. And then United is 3651; is that correct?

02:29PM MR. ROSENFELD: Yes, Judge. And then Frontier is $1,877.55.

02:29PM But just one note for the record, Judge, is we don't have a United witness here. But that didn't change the guidelines. So

02:29PM for the purposes of loss amount, we're not going to ask for United. We're still evaluating how it would work for restitution.

THE COURT: All right. It doesn't really matter. You're still in the same guideline whether I add United or not.

MR. ROSENFELD: Yes, Judge.

THE COURT: Let me ask you in terms of how you got to these numbers because the defendant was working with American Airlines.

MR. ROSENFELD: Yes.

THE COURT: And as I understood the evidence, if he had said "I'm an American Airlines employee," he wouldn't have gotten the jump seat, right. But I understood that at least with some airlines there would be benefits to traveling.

MR. ROSENFELD: Yes, Judge.

THE COURT: So it's not that he would have even purchased a coach fare; he would have had some discounted fare?

MR. ROSENFELD: Yes, Judge.

THE COURT: So do these numbers reflect what would be his employee discount if it would be applicable to these airlines?

MR. ROSENFELD: Yes, Judge. And just to clarify, as to Spirit's, as an American Airlines customer service representative, he would not have been eligible for a discount.

As to Southwest, I believe that it is more nuanced; but the answer is generally no.

Then as to Frontier, definitely not. And I have

witnesses here who can testify to that and how they arrived at that number and how they know that.

THE COURT: I'm sorry. Go ahead.

MR. ROSENFELD: And just, you know, having reviewed the transcripts, I focused very much on foundation and making sure these witnesses were prepared to explain how they know the information.

THE COURT: So when it comes to restitution, is the United States seeking restitution for all four airlines or just for Spirit?

MR. ROSENFELD: So we are still trying to evaluate what the restitution would look like. If we are seeking restitution, it would be all four; but I think we would ask for 90 days to calculate that.

THE COURT: All right. Let me jump to you now, Ms. Blenman, because I understand your argument that it's zero.

If I were to accept your argument that it's zero, I just want the record to be clear here, what are his guidelines?

MS. BLENMAN: With a zero loss amount, it would bring it to offense level -- a total offense level of nine, criminal history category I, and the guidelines would be four to ten months of course in Zone B.

THE COURT: Okay. So again let me just jump to the end here for a minute. Go ahead.

MR. ROSENFELD: Judge, may I confer with Ms. Blenman?

THE COURT: You may, sure.

(Brief pause while counsel confer.)

MR. ROSENFELD: Judge, just to confirm, the final number or the preliminary number you read out to offense Level 10, with a guideline range of six to 12; is that --

THE COURT: No. Actually, you're right because I think what I was reading was the old blue sheet.

I read 12, but I think there has been a change to that.

MR. ROSENFELD: Yes. So now it is ten, with a guideline range of six to 12, which I think is in the third addendum.

THE COURT: I think you're right. No, you're right. For some reason I started putting my notes on the old blue sheet.

MR. ROSENFELD: Yes. And so I just wanted to confer with Ms. Blenman if it was a minus two, that it would be Level 8; not Level 9.

THE COURT: Correct. So the defense argument is Level 8; and as a Level 8, he's zero to six, right?

MR. ROSENFELD: Yes, Judge, that's my understanding.

THE COURT: All right. Let me ask the government, are you --

I'm sorry. Probation is standing.

MS. SYLVESTER-PIERRE: Your Honor, I apologize for interrupting.

In the third addendum this officer did not agree with the government. We based the loss amount on the intended loss amount,

which is the reason why your recommendation page still reflects that the total offense level is a 12.

THE COURT: I'm going to accept the government's representation on that, and I am going to go to the Level 10; six to 12.

But I just want to ask the government. Are you really going to ask for incarceration in this case?

MR. ROSENFELD: Yes, Judge.

THE COURT: Well --

MR. ROSENFELD: I'm happy to explain why, but.

THE COURT: -- I really can't wait to hear it. I'm always interested in listening, but.

So I will make findings. I mean I'm going to hear the defense on variance. You know, this is a case that had it been civilly prosecuted would have gotten him into county court; just giving you the benefit of that thinking.

So let me hear from Ms. Blenman how you want to proceed with respect to the amounts. I mean the witnesses are ready. Are we ready to hear from the witnesses?

MS. BLENMAN: Your Honor, if the Court wants to hear argument and then the witnesses, I don't know if what the witnesses would share changes much of our argument; but it's of course the government's burden, so I guess however they see fit.

THE COURT: Look, so this is what I'm prepared to do, but I'm always, you know, I'm always open to hearing argument as to

why that's wrong and changing my mind.

I'm inclined to accept the government's numbers in terms of the sentencing guidelines and put him at a ten and the guidelines are six to 12.

I don't think this is a case that merits incarceration. I think the 3553(a) factors and the nature and the circumstances of the offense are such that I don't see how I don't vary to time served, with then supervised release. In my mind I just don't. This is the kind of case that is.

Now, the defense is objecting and thinks that the guideline range should be zero to six, based on your reading of the damages; so I don't want to preclude you from making that record on appeal and doing what you need to do. I'm inclined to say it's six to 12 months for guideline purposes and vary; that's obviously not what I have to do, and I want to make sure both sides are preserving their records.

MS. BLENMAN: I guess I would say, Your Honor, we are maintaining our objection as to loss amount, and I will be brief on this.

It is our position there is no actual loss and no intended loss. No actual loss because of all that we know about non-rev travel; that is, standby travel, that it is space available. That a non-rev traveler can only fly if the flight is not full, if there are open, unbought, unpaid for seats. A non-rev traveler cannot bump a paying customer. And in fact we

02:36PM heard at trial if a paying customer arrives at any point and purchases that seat, it is in fact the non-rev traveler who is booked -- who is bumped, excuse me.

And so for that reason, because a non-rev traveler can never bump a paying passenger and because if a non-rev traveler does take off on a flight, it means necessarily that for as long as the airline had the seats available for sale, there was no paying passenger, we would submit there is no actual loss.

Intended loss looks -- it looks to Mr. Alexander to the loss that he would have purposely sought to inflict. And what we know, Mr. Alexander has been in the airline industry for over a decade. Everything that I've said about non-rev travel, he knows it. We heard from many witnesses at trial; airline employees who themselves travel non-rev, it is standby; it is space available. They can never bump a paying passenger.

Because he knows that, that goes to Mr. Alexander's intent and why he never intended to inflict or cause any pecuniary harm on any of the airlines.

THE COURT: But I think -- I mean your argument goes to -- I mean those two points come off if I find that there is no loss, right?

MS. BLENMAN: Yes, Your Honor.

THE COURT: Let me ask a better question.

You're not arguing with these calculations. You're just arguing with the concept itself.

MS. BLENMAN: Your Honor, I don't know how these calculations were reached, and so I would not be in a position to say that these are valid calculations.

THE COURT: So I guess that's my point. Do we want to call these witnesses, and do you want to -- I mean, it doesn't change the guideline range, but it could change the restitution, I suppose.

So how do you want to handle the witnesses? The government is prepared to bring the witnesses on each to discuss why this is the loss.

MS. BLENMAN: I guess, Your Honor, if the Court is prepared to rule at this point on our objection, we are objecting to any loss amount assessed for all of the reasons that I said, and we are not waiving any objection as to how the loss is calculated.

I guess if the Court wanted to rule on the objection at this point, we could proceed and deal with restitution at a future date; but we are, of course, not waiving any objections.

THE COURT: So I'm going to overrule your objection because, again, this goes back to the Ciminelli argument, right. I do think that the loss amount is the amount that the airline did not gain because he otherwise would have had to pay for those seats.

I understand your argument, I think. I think I understand it. I think reasonable minds could differ on it. I

think that is a loss; and so I'll overrule your objection as to that.

I think at the end of the day it's not going to matter because even if I agreed with you -- if I agree with you, I am going to end up at the same place that I am going to end up disagreeing with you; so I think for sentencing purposes it doesn't really matter. I think the nuts and bolts of how much he is going to owe, we can leave that for restitution. I don't have an issue with doing that.

And I hear you on your argument that he didn't think he was really harming anybody because these are kind of free seats and the airline doesn't really sell these. I understand that that might have been his thinking, but I still think that the loss, to be consistent with how I ruled on the Ciminelli issue, that loss is what he should have paid to be in that seat. Because remember at least as to Spirit, he never actually sat in the jump seat. As to Spirit, he sat on a flight in a regular seat.

I hear you; they obviously hadn't sold that seat, right; that's why he got to sit there. I get that they hadn't done that, so I understand your argument. I just think the better reading of the guidelines call for a loss amount as the government has intended, which is still less than 10,000. It puts him in the six- to 12-month range.

I'll hear the government as to why I shouldn't vary. But I'll tell the defense and I'll start with the defense; I think the

nature -- and this is obviously for the government's benefit too -- I start on the 3553(a) factors to look at the nature and circumstances of the offense. And what I'm looking at is a gentleman who is clearly misrepresenting all sorts of facts; like where he worked, the code, you know. And I think that that was with an intent to defraud. It was a lot harder to find out what he was going because he kept putting in whatever on the drop-down menu. So if he kept his name, American Airlines, every time, then it probably would have been able to detect what he was doing. This randomness of the airlines I think was more troubling. I don't think he was randomly picking airlines; I think he was avoiding detection.

But at the end of the day, you're talking about someone who, at least to Spirit, which were the counts of the indictment, it's less than $5,000, right. This is a major airline. They could have, obviously, blocked him from flying. They could have sued him. I'm having trouble still understanding how they go the U.S. Attorney's office and somebody agrees to indict for $5,000. I find that really kind of hard to fully understand because this is really not a significant fraud in any way.

I mean this district is the fraud capital of the country; fraud capital of the country. And this is a fraud that, by the way, isn't something that even lends itself to repeat itself very much: We had to make an example. This is a huge problem in the airline industry of people doing this. Look, to the extent they

02:42PM have other employees who do this and who try to get away with this, I can't imagine this is the worst case you have of it; because if it is, it's not that big of a problem, right. So, right?

Because in every economic scheme the airlines do this because it benefits the airlines to help each other. There's always going to be some fraud. From Medicare to this, there's going to be some fraud afoot anytime you're putting some numbers on the table. But you also look at the scale of the fraud vis-a-vis, right, the impact or the positive impact of the program.

And so the nature and the circumstances of the case to me, and not to mention I think the case was tried in a manner which the evidence was not clear, the presentation of the evidence was not clear. The witnesses that the government presented did not set out even to rebut the argument that Ms. Blenman made now about what the loss was; I mean it was sort of all over the place.

But taking the government's presentation aside because I don't think that's neither here nor there for sentencing, I'm looking at his conduct, like, what did he do? I'm not saying that what he did was right. A jury told me it was a crime. The government prosecuted, okay. But should he be incarcerated over a $4700 fraud, in total less than 10,000? No. I mean I just don't see incarcerating him; I just don't see it.

Now, this is not his first run-in. Interestingly enough,

02:43PM the other fraud with the car is the same thing; he just puts down false names -- not false names because he has the driver's license with a false name. But, you know, false address, false information, like you've traveled in this falsity of information before, and have been convicted before; so this isn't your first time doing this.

I don't know what's going on; why you think that it's okay just to tell people, like, bad information. Maybe you didn't think you were hurting the airline, but you were getting something for free that you otherwise weren't entitled to. So yeah, maybe you didn't think you were hurting anybody because it's a big company and so what they lost $4700, but you were clearly getting a benefit you knew you weren't entitled to. I don't think you were sitting there thinking "Oh, I deserve this because I was a flight attendant 15 years ago." I don't think that at all.

And so when I put all of that together, I don't think incarceration, given the nature and circumstances of the offense. You've had a prior but you're not somebody with a long criminal history either, you've been employed for many years. When I combine the nature and circumstances of the offense, when I look at your characteristics, when I look at the need for deterrence, to me this is not a case of incarceration. I think this is a case of the maximum supervised release. You will be on supervised release for three years, you will have to pay whatever restitution there is. You know it's not going to be much. Look at these

numbers; it won't be much to pay in that time frame.

And, of course, if you do something like this again where you're just randomly giving bad information to get a benefit for yourself, it will not only be a violation of supervised release, but you'll be on your third conviction for that. I think that's enough, but Ms. Blenman might tell me that even more is required.

I'm going to hear from the government. I'm curious to see why you think incarceration for this is suitable, then I'll hear again from Ms. Blenman, and then of course I'll hear from Mr. Alexander. But I'm going to hear from the defense first. I mean I don't know what time served and three years of supervised release, maybe she wants something that's even more generous than that, and I am going to allow her obviously to allocute for her client any way she sees fit.

I'm just telling you that's my thinking. It's not my final decision; it's my thinking. I give that to you to give you some markers for your argument.

MS. BLENMAN: Your Honor, for many of the reasons and factors of this case that this Court just noted, I think time served is entirely appropriate. And our request is actually time served with no supervision to follow because I think that is sufficient, given the facts and circumstances in this case.

And the Court has said it. This is an incredibly unusual unique case. It is very easy to see that this could have been resolved in an administrative proceeding, a civil proceeding, an

02:46PM HR proceeding. And that is, of course, not where we are. We're
02:47PM in federal criminal court. Mr. Alexander at this point, he is now
02:47PM for the first time, at 35 years old, he is a convicted felon.
02:47PM That felony conviction is significant. It has impacted him to
02:47PM degrees I probably can't even articulate well enough over the last
02:47PM year.
02:47PM He is currently unemployed, has found himself
02:47PM unemployable. He is homeless. This is something that he will
02:47PM live with for the rest of his life. It is significant. He has as
02:47PM a result of this case, he has --
02:47PM THE COURT: Let me just stop you for a second.
02:47PM Why was the Maryland case not a felony? He got four
02:47PM years. I mean it was suspended, but it was still a four-year term
02:47PM of imprisonment.
02:47PM MS. BLENMAN: I looked at it, Your Honor, and it is an
02:47PM oddity. In Maryland misdemeanors can actually be punishable by
02:47PM years of incarceration. And so Mr. Alexander as a result of this
02:47PM case is a convicted felon. He was not previously.
02:48PM THE COURT: Although that conduct was worse than this
02:48PM one. I mean you're not going to agree with me on that, but that
02:48PM was $17,000. He took a Kia without being able to pay for it after
02:48PM giving false information. But I guess the moral of the story is
02:48PM don't live in Maryland.
02:48PM MS. BLENMAN: I think that is one fair take from that.
02:48PM It is, of course, a case from ten years ago; some dispute

ultimately about how he purchased a car and whatever information he may or may not have provided in purchasing the car.

But as it stands, he is now a convicted felon as a result of this case. That is a tremendous consequence he will live with for the rest of his life. He has lost his career. Your Honor heard in trial Mr. Alexander has been in the airline industry for over a decade. He, of course, can no longer work in that capacity in that industry. The government is seeking to revoke his licenses; licenses he, of course, worked very, very hard to earn. That is separate collateral consequence that flows just from this case.

THE COURT: Let me just say on that.

Even if this had been handled administratively, he probably would have, I think, certainly lost his career in the airline industry, right. If he had been sued for this or if he had been terminated at American Airlines for this conduct, I don't think that that -- I think being a felon certainly has serious ramifications.

The employment ones were probably coming to him anyway. I think the convicted felon and his ability now to go into another industry, of course, is difficult if he is a felon. I understand that.

MS. BLENMAN: Your Honor, I think there is a world where Mr. Alexander could have worked his way back to the airline industry. He actually post-verdict --

02:49PM He applied for a position prior to this trial. Post-verdict he actually received an offer letter from Amazon at an airport, and they were interested in hiring him. I think even if he had faced internal administrative civil penalties, he could have perhaps with time, with work, worked his way back to the industry. Now with a felony conviction, I think that is absolutely not going to happen.

Another consequence he has faced as a result of this case, this case, for whatever reason, became a media case and --

THE COURT: Oh, I know why. Because somebody put it out in a press release.

MS. BLENMAN: Yes.

THE COURT: That's how.

MS. BLENMAN: And as a result then of the government's press release, there were articles written, there were family members, friends, former coworkers reaching out to Mr. Alexander; that was deeply embarrassing. There were strangers on the Internet, on blogs, on reputable news sites just deriding him and saying really nasty and ugly things. He has had to experience that as a result of this case. That has been punishment.

He's been on bond. I guess I'll pause to that point, Your Honor. I think those are the reasons why time served, why this conviction alone is sufficient. But what we've seen in the last year I think tells us why supervised release to follow is not necessary here. We know Mr. Alexander -- this case has, you know,

it's been pending for some time of course. Mr. Alexander has been on pretrial release for nearly a year. February next month will make a year that he's been on pretrial release, and we've seen him reporting to his supervision officer, doing well on supervision. He has never tested positive for any controlled substance. There is no mental health treatment or conditions probation has deemed him in need of, and so this is not someone who needs those services or that oversight from the Court with resources being sort of finite as they are.

And so I think taking all of those things together, how very unusual this case is, the number of consequences and different arenas of his life that Mr. Alexander has faced, and that he is not someone who is in need of services or oversight from the Court, I would submit that time served, with no supervision to follow, is a sufficient and not greater than necessary sentence in this case.

THE COURT: All right. Government.

MR. ROSENFELD: Judge, we're seeking a bottom of the guideline sentence of six months, and that's for a couple of reasons.

The first point is, as Your Honor noted, this is not his first rodeo. I believe this will be his fourth -- if Your Honor imposes probation, this will be his fourth sentence of probation. I believe he has the one in Maryland at paragraph 63. He has one in paragraph 64 where again he was --

02:53PM THE COURT: That's driving. That's a driving ticket.

02:53PM MR. ROSENFELD: Yes. He received a year probation, and he provided someone else's identification.

02:53PM THE COURT: The traffic offense?

02:53PM MR. ROSENFELD: Yes. And 65 is again.

02:53PM THE COURT: A traffic offense.

02:53PM MR. ROSENFELD: So that's the first point. This is not his first run-in. This will be his fourth sentence of probation.

02:53PM THE COURT: But these are traffic offenses, right?

02:53PM MR. ROSENFELD: Yes.

02:53PM THE COURT: And do you have anything to dispute the defense lawyer's argument that the other probation in Maryland was a misdemeanor? I mean I had never heard of a misdemeanor being more than a year, but I accept her representation; I have no reason not to.

02:53PM MR. ROSENFELD: No, I don't Judge. I did want to address the other point that Ms. Blenman made, which was about how he was doing on bond.

02:53PM And the first couple paragraphs of the PSI indicate that he was not doing well on bond.

02:53PM THE COURT: Well, because as a result of this he was homeless and living, like, out of his car.

02:53PM MR. ROSENFELD: Well, I guess it's unclear. It's unclear for a couple of reasons. He ends up in the Middle District of Florida without permission. He was providing PO Boxes; but at the

same time we don't know his finances. And we also according to the PSI, he is flying all over the world; to Africa, to Asia. I would just say that it's unclear.

THE COURT: He wasn't doing that after he was arrested.

MR. ROSENFELD: No.

THE COURT: We know how he was doing it before because he was flying for free. Isn't that what this case is about?

MR. ROSENFELD: Yes. That's the third point, Judge. So this was not a -- so we heard that he was in the airline industry for over a decade, and for the majority of that, for six years at least he was flying for free, and so he was given this code as a flight attendant because that's a position of trust. That's not an enhancement we're seeking, but I think it's a relevant point to make. This is a code that's given. So like the FAA credentials these people and trust them and that's why they're here. For a decade he is abusing that position of trust. And so --

THE COURT: I'm glad you didn't seek that enhancement.

MR. ROSENFELD: We did not, Judge.

THE COURT: That was a good call.

MR. ROSENFELD: So for those reasons, this is not his first rodeo, he is flying all over the country for years and years and years.

THE COURT: The thing that's crazy about this case is he could have done it just on American. Listen, I've flown on all these, except Frontier. I don't know why he'd rather fly Spirit

than American anyway; but he could have flown American to all these things.

Does anybody have an explanation for that? Can't he fly just on American for, like -- because there was one international flight he had to pay for. It was, like, 150 bucks he paid for it.

MR. ROSENFELD: I don't have an American representative here. It's potential that it was not the case that he could have flown on American for free because he was a customer service representative, but I don't --

THE COURT: He could have clearly flown at a very reduced rate because, like I said, I have never worked for an airline. But that's the beauty of working for the airlines; like you don't get the jump seat, right, unless you're a pilot or a flight attendant, but you get to fly. Those friends and family on the airlines, they are all fairly generous. And American is a really significant airline; it might have been harder, he might have had to wait longer, maybe he had to pay 50 bucks or a hundred bucks, but that's ridiculous. He could have just flown American and paid a hundred bucks.

And now he is a felon because he chose to fly Sprit, which, no offense to Spirit, but wow.

MR. ROSENFELD: So, Judge, for all of those reasons, we think it is worth sending a message to this defendant in particular and to the community --

THE COURT: I think a felony conviction is a big message.

02:56PM MR. ROSENFELD: Yes, Judge. Thank you. So we're asking for bottom of the guidelines. Thank you.

02:56PM THE COURT: Ms. Blenman, anything further?

02:56PM MS. BLENMAN: Your Honor, I think the Court has already identified why the limited priors relied on by the government are not persuasive here. Separate and apart from the fact that it is a misdemeanor and then traffic offenses, we have that these are over ten years old at this point. These are offenses from 2014 and 2015.

02:57PM As it relates to the very beginning of this case, Mr. Alexander was and is homeless, and he was struggling to sort of get himself where he needed to be with those constraints, those very real constraints. As it is now, he is living out of his vehicle. He has not been able to find employment. He is parking where it is safe to do so; but yet and still he is reporting to probation, he has never tested positive, and he is where they need him to be when he needs -- when they need him to be there.

02:57PM To deterrence, to specific deterrence, deterrence I don't think applies here. Counsel is in favor of an incarcerative sentence or of supervised release. Mr. Alexander is no longer in need of neither. He cannot fly using any code that he may have had before.

02:57PM As to general deterrence, I think the Court noted earlier, there is no reason to believe this is any enduring problem in the industry. Any sort of deterrence-based rationale I

02:58PM just don't think holds water here.

02:58PM But what is true is that Mr. Alexander is now a convicted felon and it has impacted him even in the last year and it will do so for the rest of his life. And because that is a tremendous penalty, a tremendous consequence to be living with, and because there are no -- because there is no drug problem, because there is no mental health problem, because the resources aren't needed in that way, that oversight isn't needed in that way, his last prior is ten years ago, I would submit time served, without supervised release to follow, would be appropriate here.

02:58PM THE COURT: All right. Mr. Alexander, you have a right to address the Court before I make a final decision. Is there anything you would like to say, sir?

02:58PM MS. BLENMAN: Court's brief indulgence?

02:58PM THE COURT: Of course.

02:58PM (Brief pause to confer with his attorneys.)

02:59PM THE DEFENDANT: Yes, Your Honor. As I said -- as I stated -- for the record, I'm Tiron Alexander, and I would be remiss not to address this since we're at sentencing.

02:59PM Respectfully I acknowledge what has occurred and what's transpired. I just want to let you know, Your Honor, that it's interesting that with inference narratives replacing -- sorry. I'm taking this in.

02:59PM With inference narratives replacing hard concrete proof, it's just interesting to be in this position. I just don't

02:59PM understand what the Court, you know, sees. But as the defendant, I willfully take what has happened today. And with all of that -- excuse me, ambiguity that has happened, I will be sure to get clarity in the future about anything that is necessary.

And I also want to say that historically seeing what this country has gone through with the Salem trials, it's just interesting that this is going to be my future now at this point. So I just want to let the Court know that I accept what has happened and will go forward with the -- with the sentence.

THE COURT: All right. Anything else, Ms. Blenman?

MS. BLENMAN: No, Your Honor.

THE COURT: All right. I'm prepared to move forward now to pronounce sentence.

Look, you know, I guess maybe someday, maybe after I retire, somebody at the U.S. Attorney's office will tell me why this case was indicted. I still don't see it. But I don't exercise prosecutorial discretion. That's not my job; that's their job. And for whatever reason, they have decided to exercise it on a case where the loss to major corporations, individually the greatest loss was $4,000, to a major corporation, in the most generous reading of loss. That's county court. If you had sued him, they wouldn't get to the new courthouse; you would be at county court somewhere. I don't see it. I don't see a pattern in his history. I don't see what the government was doing here.

But that being said, they did it. They indicted him.

35

03:01PM The legal challenges to the indictment I have found are not sufficient. My job is to look at the law on that, and I think the law is what it is. I may like it, not like it, agree, disagree. That's not my job. My job is to interpret it as best I can. The legal challenges to the indictment, for me at least, were not sufficient.

There were some evidentiary challenges that were close. But again, my job is to look at the facts and law. And the law at this stage is really almost -- it's a very tough, very tough hill to climb. The government doesn't have to do much to survive that postjudgment motion, and I think here it does. It doesn't do it by much but it does, and I think that's my fairest reading of the facts.

And so now I sit to sentence someone who is now going to be a convicted felon, who not only -- you know, maybe Ms. Blenman is right; that he would have been able to come back in the industry. I think that probably would have been tough if he had been sued for this, right, if he had a judgment for this, if this had been on his, you know, on his performance, you know, if he had been terminated from an airline for this, I think that probably would have done the same. But there is no doubt that having a felony conviction will be life altering. There's just no doubt; felony convictions are life altering.

I see no benefit, no justice to be served by an incarceration at all. I don't see it. I don't think it merits

03:03PM it. The amount of the loss here is as small as I've ever seen it. It's also not the loss -- he wasn't defrauding, you know, a church group, senior citizens, a charity. I mean, again, I'm not saying that it's okay to defraud a big company, but it's like let's be reasonable here. And so I just don't see how the case itself, the nature and circumstances of the case, are such that call for incarceration. This is such an unusual fraud case in this district. I mean I have real fraud cases where I've given people time served on health care fraud cases, where the guidelines are higher and I have given people time served because I think the circumstances of their fraud were not significant enough for an incarcerative term. So I don't see the incarceration at all in this case.

03:04PM The government argues that he's been on probation four times. I mean, really? One is for the car issue, which was for putting false information. Typically that gets you sued. That's also something that typically gets you sued, not arrested. Then the other things are traffic; they're driver's license issues. He does not have the kind of criminal history where I think another, you know, not sentencing him to incarceration sends the wrong message to him or wouldn't be just. I think a felony conviction for this conduct, honestly, is extraordinary and beyond anything that I think was necessary; but it's all I can do given what the record is.

03:05PM I do think he needs a period of supervised release

03:05PM because he is clearly struggling with this felony conviction. So you can find a job. I mean it's not going to be the kind of job you had before, but I'm struggling to understand why it is that you can't find some job. It's not going to be the kind of job you're used to, clearly. Right. You're going to have to find your way someplace else. And you're going to have to find it because there will be some restitution you will have to pay; not to mention the $500 special assessment.

03:05PM Do I think you need to be drug testing and seeing the probation officer every week? No. That's a waste of everybody's time. But I do think that putting you on supervised release for a year, with the only condition being that you pay whatever restitution is finalized and your assessments, is appropriate.

03:05PM So you'll have a probation officer essentially, right. You won't be on probation; we call it supervised release. And I am going to require two things; that you be employed; and that you pay whatever restitution and the special assessment you have.

03:06PM And so I think that given the charge, given your history, I think that that's appropriate. I think it's just. I think it's necessary under the factors to give you a small time of supervised release to help you get on your feet, to help you get a job. You need to start working. There are debts you have to pay here and you're going to have, you know, there is no reason why you wouldn't be able to pay them; but I do think it's important that you have --

It will be, like I said, your only requirement will be that you maintain employment and that you pay the fines and restitution to the extent -- I don't know what the restitution is going to be in this case yet. I suspect it's not going to be the number the government is already suggesting. It's not going to be $10,000. Let's get a little realistic on that number quickly. I'm happy to have a hearing in 90 days, but I would encourage you to be a little more realistic about that restitution and about how those numbers were derived.

But I don't see an incarceration here is at all appropriate. I think the felony conviction is really harsh for this conduct. But I do think some supervised release is appropriate. It will be a year, it will be nonreporting, but you have to be employed. So you will have to provide some kind of employment verification to your probation officer. I'll let them figure that out, but you're going to have to find a job. Let me pronounce the sentence now for the record.

I have considered the statements of the parties, the presentence report, which contains the advisory guideline range, which I have accepted is a total offense Level 10, six to 12 months, and the statute factors set forth in 18 U.S.C. 3553(a).

I find that you're not able to pay a fine in addition to mandatory restitution.

For the record reasons I have just articulated, I do think a variance in this case is appropriate. I think a six-month

03:08PM term of incarceration at the low end of the guidelines is still
03:08PM unwarranted and would not be just and would be excessive.

03:08PM And so it is my judgment that you, Tiron Alexander, are
03:08PM committed to the Bureau of Prisons to be imprisoned for a period
03:08PM of time served as to Count 1 through 5. And then I will order you
03:08PM to one year of supervised release.

03:08PM I have considered the factors there. For the reasons
03:08PM I've stated, I do find that supervised release is appropriate.
03:08PM Your only conditions of supervised release will be that you
03:08PM maintain employment, you're going to have to provide some
03:08PM certification of that employment to probation, I'll let probation
03:08PM work that out, and you will have to pay whatever restitution we
03:08PM set after that hearing, and you'll have to pay the special
03:08PM assessment. I find that that special assessment, which is due
03:09PM immediately, is the $500; a hundred dollars for each count;
03:09PM Counts 1 through 5.

03:09PM In terms of how you pay that restitution, again,
03:09PM depending on the job that you have, I've going to let probation
03:09PM work with you on that, and they can set it at the amount that they
03:09PM feel is appropriate. I'm going to let you work with the officer
03:09PM on that. I don't want them -- I don't want to put you in a
03:09PM position where you're just working to pay the restitution. You'll
03:09PM never get back on your feet that way, right; but you do have a
03:09PM restitution to pay.

03:09PM By the way, if they had pursued this case civilly and you

03:09PM lost, you would have a judgment against you for this amount which you'd have to pay. You wouldn't be able to rent a house or a car or anything like that with an unpaid judgment or a bankruptcy or anything like that; so I think paying these things is reasonable. And, again, you'll be put on a plan where you can pay them and still get back on your feet.

03:09PM So is there any forfeiture in this case? There isn't, right?

03:09PM MR. ROSENFELD: No, Judge.

03:09PM THE COURT: All right. So your total sentence is time served, one year of supervised release, with a condition only being employment and the payment of the special assessment, which is $500, and the restitution.

03:10PM And the restitution will be set out at a hearing 90 days from today. Donna, that's -- I'm sorry. I already have the date. It's April 23rd at 4:00 p.m. So April 23rd at 4:00 p.m. is the restitution. I don't think there is going to be an agreement on the restitution is my guess. That's fine. That's what I'm here for. But I'm really going to ask the government here: Be reasonable on those numbers.

03:10PM You know, restitution for these airlines that weren't part of the indictment, that I didn't hear evidence on, I'll see what you bring in restitution, right, I'm not closing my mind to it, but be reasonable on what that number is and what that loss for those airlines really was and what those programs were and

what an American employee who had done it correctly might have paid on those flights, and how certain are we of that number.

Like I said, for purposes of the loss amount, it wasn't going to matter for the restitution because I did not find that an incarcerative period was appropriate; but for restitution I'm going to be asking those questions. And so I know you have a job to do; remember I have a job to do, too. But I would encourage you to be reasonable; although, I don't suspect that there will be any kind of agreement on the restitution. All right.

I'll definitely be in trial in that April time frame, so you're set for 4:00 p.m. If you need more than an hour and a half, let me know, and I will have to straddle you amongst a couple of days because I don't think --

Well, this is late-breaking news, I guess, for the people on the Palacios team, I'm not breaking on any day. I'll be sitting five days a week. We'll take some afternoons is what we're going to do, we'll have short days, but I won't have a whole day that I take. I've changed my mind on that.

So if you need more than an hour and a half on that restitution hearing, please tell us as soon as you can because I'll squeeze you in or maybe I'll just do it after Palacios, which should end sometime in May. That's the best I can do in terms of the timing.

Ms. Blenman, anything else on behalf of your client?

MS. BLENMAN: Your Honor, I do think I need to renew our

03:12PM objections filed at Docket Entry 101; specifically, the objection
03:12PM as to loss amount.

03:12PM I don't believe the Court ruled on our factual
03:12PM objections. I don't need to be heard. That's just for purposes
03:12PM of appellate review.

03:12PM THE COURT: Right. So I think I'll overrule those for
03:12PM the reasons I've stated on the record; but your objections as to
03:12PM the calculation of the loss, they're preserved in full. Not only
03:12PM for sentencing purposes, but they're preserved. I think they go
03:12PM hand in hand with your Ciminelli argument, which I think obviously
03:12PM is preserved as well.

03:12PM MS. BLENMAN: Understood. Thank you, Your Honor.

03:12PM THE COURT: Anything further?

03:12PM MS. BLENMAN: Nothing from the defense.

03:12PM THE COURT: On behalf of the United States?

03:12PM MR. ROSENFELD: No, Judge. Thank you.

03:12PM THE COURT: On behalf of probation?

03:12PM MS. SYLVESTER-PIERRE: Yes, Your Honor, please.

03:12PM Based on the change to the loss amount, I believe that
03:13PM the combined offense level and the total offense level is 11,
03:13PM which would result in a guideline range of eight to 14 months.

03:13PM THE COURT: How is it not ten? I think the government's
03:13PM position is that it was ten.

03:13PM MS. SYLVESTER-PIERRE: If it's ten, Your Honor, then that
03:13PM would mean that the two-level adjustment for trespass would need

03:13PM to be removed as well.

03:13PM THE COURT: You've lost me. Why? What do you mean?

03:13PM MS. SYLVESTER-PIERRE: In order for the offense level to be -- the total offense level to be a ten.

03:13PM THE COURT: Correct. Finish your sentence.

03:13PM MS. SYLVESTER-PIERRE: Your Honor, if you'd like, we can go through the guidelines. But even in the government's objection to the presentence report, they indicated that the total offense level is also an 11, with an advisory guideline range of eight to 14 months; and the reason is because of the number of units, Your Honor. The defendant will still receive -- the defendant would receive two units.

03:14PM THE COURT: All right. I mean it's academic either way.

03:14PM But, government, is it 10 or 11? What's your position?

03:14PM MR. ROSENFELD: I'm going to stick with 10, Judge.

03:14PM THE COURT: All right. I am going to stick with the government on this one. For better or for worse, we're going down together on that one. It doesn't really matter because the variance is what the variance is; so I'll leave it at 10.

03:14PM You can note, you know, your objection or what your calculation is for the record. Again, it's really irrelevant whether it be 10 or 11 because either way I'm varying to non-incarceration; and either at 10 or 11, the bottom of the guideline would have been incarceration.

03:14PM MS. SYLVESTER-PIERRE: Yes, Your Honor. I just wanted to

03:14PM make sure it was correct for the record.

03:14PM THE COURT: No, I appreciate it. Thank you very much.

03:14PM THE COURTROOM DEPUTY: Judge, the supervised release as to the five counts, is that to run concurrently?

03:14PM THE COURT: Yes, they all run concurrently.

03:15PM THE COURTROOM DEPUTY: Thank you.

03:15PM THE COURT: All right. We're in recess.

03:15PM One more thing; very important; your appellate rights.

03:15PM So obviously you have a right to appeal, sir. Your counsel has already preserved the objections for the record, all right.

03:15PM You have the right to appeal the conviction of the sentence I imposed. Any notice of appeal has to be filed within 14 days after the entry of the judgment. That judgment will be entered either today or Monday; it just depends on how quickly the clerk's office picks up the order.

03:15PM If you're unable to pay the cost of the appeal, you may apply for leave to appeal in forma pauperis. Thank you very much.

03:15PM THE COURTROOM DEPUTY: And his passport, Judge.

03:15PM THE COURT: Does probation still have his passport?

03:15PM MS. SYLVESTER-PIERRE: Yes, Your Honor.

03:15PM THE COURT: That can be returned to him.

03:15PM Does the government have any objection to his passport being returned?

03:16PM MR. ROSENFELD: No objection.

03:16PM THE COURT: You can return the passport to him.

03:16PM MS. BLENMAN: Thank you very much.

03:16PM THE COURT: Thank you very much.

03:16PM (Proceedings recessed at 3:16 p.m.)

C E R T I F I C A T E

I, VERNITA ALLEN-WILLIAMS, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable JACQUELINE BECERRA, one of the judges of said Court, at Miami, Florida, on January 23, 2026.

/s/Vernita Allen-Williams___
VERNITA ALLEN-WILLIAMS, RMR, FCRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
(305) 523-5938